IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE:  ASBESTOS PRODUCTS | ) | |
| LIABILITY LITIGATION | ) | |
| (NO. VI) | ) | |
| | ) | |
| This Document Relates To: | ) | MDL 875 |

THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| MARTHA ADAMS, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | CIVIL ACTION CASE NO.: |
| | ) | |
| | ) | |
| ALBANY INTERNATIONAL, et al. | ) | 2:07-CV-1064-WKW |
| | ) | |
| Defendants. | ) | |

_____

NOTICE OF TAG-ALONG ACTION

PLEASE TAKE NOTICE that on July 29, 1991, the Judicial Panel on Multidistrict Litigation entered an order transferring all asbestos cases pending before the federal court to the United States District Court, Eastern District of Pennsylvania, for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407 ("MDL Transfer Order"). That order also applies to "tag-along actions," or actions involving common questions of fact filed after the January 17, 1991, filings of the Panel's Order to Show Cause.  MDL Rule 7.5(e) provides:

Any party or counsel in actions previously transferred

under any section 1407 or under consideration by the Panel

for transfer under section 1407 shall notify the Clerk of the

Panel of any potential "tag-along actions" in which that party is

also named or in which that counsel appears.

The undersigned hereby notifies the court that this case is a potential "tag-along

action" which may be subject to transfer to the Eastern District of Pennsylvania.  The Clerk

of the Panel may either (1) enter a conditional transfer order pursuant to MDL Rule 7.4(a)

or (2) file an order to show cause why the action should not be transferred, pursuant to

MDL Rule 7.5(b).

A copy of the Complaint is attached.


s/James A. Harris, III
James A. Harris, III
Bar Id # ASB-0683-R74J
Nicole M. Hardee
Bar Id# ASB-0073-P71G
2501 20th Place South
Suite 450
Birmingham, AL  35209
FAX:  (205) 871-0029
TEL:  (205) 871-5777
Email: jamey@harris-harris.com
Email: nicole@harris-harris.com

OF COUNSEL:

Harris & Harris, LLP                              Attorneys for Bechtel


## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of January, 2008 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.


s/James A. Harris, III
OF COUNSEL

RECEIVED

THE UNITED STATE DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA    DEC  5 2007

CLERK
U.S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | |
|---|---|
| **MARTHA ADAMS** spouse and personal representative for the **ESTATE OF CHARLES ADAMS**, deceased; | ) ) ) ) |
| **CYNTHIA COACHMAN** spouse and personal representative for the **ESTATE OF MATTHEW COACHMAN**, deceased; | ) ) ) **CIVIL ACTION** ) Case No. |
| **VALIE OGLES** mother and personal representative for the **ESTATE OF JAMES O. DAVIS**, deceased; | ) ) ) |
| **TERESA WATSON** daughter and personal representative for the **ESTATE OF SHIRLEY MARIE GILBERT**, deceased; | **2:07-cv-01064-WKW-TFM** ) ) |
| **MOLLIE GRESHAM** spouse and personal representative for the **ESTATE OF ARCHIE L. GRESHAM, SR.**, deceased; | ) **JURY DEMAND** ) ) |
| **JANNIE HICKS** spouse and personal representative for the **ESTATE OF WILLIE HICKS**, deceased; | ) ) ) |
| **PAULINE M. MATTHEWS**; | ) ) |
| **BOBBIE PRENTICE**; | ) ) |
| **PATSY W. MIBUS** spouse and personal representative for the **ESTATE OF CHARLES WEBB**, deceased; | ) ) ) |
| **BEVERLY AGEE** daughter and personal representative for the **ESTATE OF YON WIGGINS**, deceased; | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| **ASBESTOS DEFENDANTS:** | ) ) |
| **ALBANY INTERNATIONAL;** | ) ) |
| **ALLIS-CHALMERS CORPORATION** | ) |

PRODUCT LIABILITY TRUST;    )
                            )
AMERICAN OPTICAL CORPORATION;    )
                            )
AMERICAN STANDARD, INC.;    )
                            )
ANCHOR PACKING COMPANY;    )
                            )
ARVINMERITOR, INC.;    )
                            )
ASTEN JOHNSON, INC., individually and as    )
successor-in-interest to ASTEN, INC., successor-in-    )
interest by way of name change to ASTEN GROUP,    )
INC., formerly trading as ASTEN-HILLS    )
MANUFACTURING CO.;    )
                            )
BAYER CROPSCIENCE, INC., individual and as    )
successor to AVENTIS CROPSCIENCE USA, INC.    )
f/k/a RHONE-POULENCE AG CO., f/k/a    )
AMCHEM, PRODUCTS, INC., BENJAMIN    )
FOSTER CO.;    )
                            )
BELL & GOSSETT, a subsidiary of ITT    )
INDUSTRIES;    )
                            )
BECHTEL CONSTRUCTION COMPANY;    )
                            )
BONDEX INTERNATIONAL INC.;    )
                            )
BORG WARNER CORPORATION by its    )
successor in interest, BORGWARNER MORSE    )
TEC INC.;    )
                            )
BP AMERICA, as successor in interest to AMOCO    )
CHEMICAL COMPANY, AMOCO CHEMICALS    )
COMPANY, PLASKON ELECTRONIC    )
MINERALS, AVISUNCORP., CARBORUNDUM,    )
ATLANTIC RICHFIELD COMPANY/ARCO    )
METALS, as successor in interest to ANACONDA    )
AMERICAN BRASS COMPANY, AMERICAN    )
BRASS COMPANY, and ANACONDA CO.;    )
                            )
BP AMOCO CHEMICAL COMPANY;    )
                            )
BUFFALO PUMP INC.;    )
                            )

2

CERTAINTEED CORPORATION;                              )
                                                      )
CLARK-RELIANCE CORPORATION;                           )
                                                      )
CLEAVER BROOKS, a division of AQUA CHEM;              )
                                                      )
CONWED CORPORATION;                                   )
                                                      )
COOPER INDUSTRIES, LLC, f/n/a COOPER                  )
INDUSTRIES, INC., individually and as successor-      )
in-interest to CROUSE-HINDS;                          )
                                                      )
CRANE CO., individually and as successor in interest  )
to DEMING PUMP, CYCLOTHERM, HYDRO-                    )
AIRE, LEAR ROMEC, RESISTOFLEX,                        )
SWARTWOUT CO., STOCKHAM VALVE                         )
COMPANY, WEINMAN PUMP COMPANY,                        )
CHEMPUMP, and BURKS PUMPS;                            )
                                                      )
CRANE PUMPS SYSTEMS, individually and as              )
successor to all pump companies acquired by          )
CRANE;                                                )
                                                      )
CROWN, CORK, & SEAL COMPANY, INC.;                   )
                                                      )
CROWN HOLDINGS, INC., successor-in-interest to        )
MUNDET CORK CORP.;                                   )
                                                      )
CUTLER HAMMER, currently referred to as               )
EATON ELECTRICAL, INC.;                              )
                                                      )
D. B. RILEY, INCORPORATE;                            )
                                                      )
EATON CORPORATION;                                    )
                                                      )
EMERSON ELECTRIC CO.;                                )
                                                      )
EXTECO, INC., f/k/a THERMO ELECTRIC CO.,             )
INC.;                                                 )
                                                      )
FMC CORPORATION, individually and on behalf          )
of its former CONTRUCTION EQUIPMENT                  )
GROUP, and former PEERLESS PUMP                      )
DIVISION, COFFIN TURBO PUMPS, and                    )
CHICAGO PUMP, business;                              )
                                                      )

3

FLAME REFRACTORIES, INC.;   )
            )
FOSECO, INC.;       )
            )
FOSTER-WHEELER CORPORATION; )
            )
GARLOCK SEALING TECHNOLOGIES L.L.C.; )
            )
GEORGIA-PACIFIC CORPORATION; )
            )
GENERAL ELECTRIC CO.;   )
            )
GOODYEAR TIRE AND RUBBER CO.; )
            )
GOULDS PUMPS INC.;    )
            )
GUARD-LINE, INC.;     )
            )
HOBART BROTHERS COMPANY;  )
            )
HONEYWELL, INC., specifically excluding liability )
for NARCO, individually and as successor to )
ALLIED SIGNAL, BENDIX, WHEELABRATOR, )
RUST ENGINEERING, AND ALLIED )
CHEMICAL;       )
            )
IMO INDUSTRIES, INC., formerly IMO DE )
LAVAL, formerly TRANSAMERICA DE LAVAL )
TURBINE;       )
            )
INDUSTRIAL HOLDINGS CORPORATION, )
f/k/a THE CARBORUNDUM COMPANY; )
            )
INGERSOLL-RAND COMPANY;   )
            )
ITT INDUSTRIES INC.;    )
            )
JOHN CRANE, INC., f/k/a JOHN CRANE )
PACKING COMPANY;    )
            )
KAISER GYPSUM COMPANY, INC.;  )
            )
KELLY-MOORE PAINT COMPANY, INC.; )
            )
THE LINCOLN ELECTRIC COMPANY; )
            )

KOPPERS INDUSTRIES;                                              )
                                                                 )
MAREMONT CORPORATION;                                            )
                                                                 )
METROPOLITAN LIFE INSURANCE                                      )
COMPANY;                                                         )
                                                                 )
MOBIL OIL;                                                       )
                                                                 )
NATIONAL SERVICE INDUSTRIES, INC., f/k/a                         )
NORTH BOTHERS, INC.                                              )
OGLEBAY NORTON COMPANY;                                          )
                                                                 )
OWENS-ILLINOIS, INC.;                                            )
                                                                 )
P&H CRANES;                                                      )
                                                                 )
PNEUMO ABEX LLC, successor in interest to                        )
ABEX CORPORATION;                                                )
                                                                 )
RAPID AMERICAN  CORPORATION;                                     )
                                                                 )
RILEY INC., f/k/a BABCOCK BORSIG POWER                           )
INC., a/k/a RILEY STOKER CORPORATION;                            )
                                                                 )
ROCKBESTOS-SURPRENANT CABLE                                      )
CORPORATION, f/k/a THE ROCKBESTOS                                )
COMPANY;                                                         )
                                                                 )
ROCKWELL AUTOMATION, successor by merger                         )
to ALLEN-BRADLEY CO., LLC;                                       )
                                                                 )
SCHNEIDER ELECTRIC INDUSTRIES, S.A.S.,                           )
NORTH AMERICAN DIVISION;                                         )
                                                                 )
SEPCO CORPORATION;                                               )
                                                                 )
SQUARE D COMPANY;                                                )
                                                                 )
SUNBEAM PRODUCTS INCORPORATED, f/k/a                             )
SUNBEAM CORPORATION;                                             )
                                                                 )
SURFACE COMBUSTION;                                              )
                                                                 )
TH AGRICULTURE & NUTRITION, LLC;                                 )
                                                                 )

THE MARLEY-WYLAIN COMPANY, d/b/a )
WELL-MCLAIN COMPANY, INC.; )
 )
THIEM CORPORATION, successor by merger to )
UNIVERSAL REFRACTORIES CORP.; )
 )
USX CORPORATION as successor in interest to )
UNITED STATES STEEL, LLC, formerly known as )
TENNESSEE COAL AND IRON; )
 )
UNION CARBIDE CORPORATION; )
 )
UNIROYAL FIBER AND TEXTILE & DIVISION )
OF UNIROYAL, INC.; )
 )
UNITED STATES STEEL CORPORATION; )
 )
VIACOM INC., successor by merger to CBS )
CORPORATION f/k/a WESTINGHOUSE )
ELECTRIC CORPORATION; )
 )
WARREN PUMPS, INC.; )
 )
ZURN INDUSTRIES, INC.; )
 )
       Defendants. )
 )
 )
 )
 )
 )
 )
 )
 )
 )
 )
 )
 )
 )
 )
 )
 )
 )
 )
 )

## COMPLAINT

Plaintiffs allege and complain against the above-named Defendants, and each demands a jury trial of all issues and causes of actions:

## JURISDICTION

This Court has subject jurisdiction over this case pursuant to 28 U.S.C. § 1332. Plaintiffs are resident citizens of the State of Alabama, Tennessee and Arizona, and Defendants are corporations whose principal places of business are in states other than the State of Alabama. The amount in controversy, exclusive of interest and costs, exceeds $75,000.00 and is within the jurisdiction of the Court.

## STATUTE OF LIMITATIONS

"Federal courts sitting in diversity cases must apply the substantive laws of the states in which they sit, and statutes of limitations are considered substantive" *Van Buskirk v Cary Canandian Mines, Ltd.*760 F.2d 481(3rd Cir. Pa., 1985). Therefore, the Alabama Statute of limitations, and other related statutes, apply to this case.

## BACKGROUND FACTS — THE PLAINTIFFS

1.    Plaintiff **MARTHA ADAMS**'s Decedent, **CHARLES ADAMS,** a resident of Hayden, Alabama, prior to his death contracted one or more asbestos-related diseases including Lung Cancer.    Decedent was continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout his employment, and in his environment while employed.

During the course of his employment, Decedent Charles Adams worked, including but not limited to, as a laborer working with asphalt for the State of Alabama from 1963-

1965, in Birmingham, Alabama; as a mechanic for Great Dane from 1966-1967, in Birmingham, Alabama; as a trailer repairman for Howard Haul from 1968-1969, in Birmingham, Alabama; as a welder for General Steel Tank from 1969-1975, in Birmingham, Alabama; as a truck driver and repaired trucks for Reliable Transfer from 1976-1978, in Birmingham, Alabama; as a steel cutter for Metal Services from 1982-1987, in Birmingham, Alabama; as a welder for O'Neal Steel from 1988-2002, in Birmingham, Alabama; around furnaces, boilers, turbines, and other industrial equipment in his workplace, which contained significant amounts of asbestos-containing products and materials.

Plaintiff's Decedent died of Lung Cancer as the result of exposure to asbestos and asbestos-containing materials and products, on or about, December 12, 2005. This case is brought by Decedent, Charles Adam's spouse and personal representative Martha Adams.

2.      Plaintiff **CYNTHIA COACHMAN**'s Decedent, **MATTHEW COACHMAN**, a resident of Cottondale, Alabama, prior to his death contracted one or more asbestos-related diseases including Lung Cancer. Decedent was continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout his employment, and in his environment while employed.

During the course of his employment, Decedent Matthew Coachman worked, including but not limited to, as an aircraft conditioner for PEMCO/Hayes International from 1982-2005, in Birmingham, Alabama; around furnaces, boilers, turbines, and other industrial equipment in his workplace, which contained significant amounts of asbestos-containing products and materials.

8

Plaintiff's Decedent died of Lung Cancer as the result of exposure to asbestos and asbestos-containing materials and products, on or about, December 16, 2005. This case is brought by Decedent, Matthew Coachman's spouse and personal representative Cynthia Coachman.

3.    Plaintiff **VALIE OGLIES**'s Decedent, **JAMES O. DAVIS**, a resident of Birmingham, Alabama, prior to his death contracted one or more asbestos-related diseases including Lung Cancer.   Decedent was continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout his employment, and in his environment while employed.

During the course of his employment, Decedent James O. Davis worked, including but not limited to, as a pipefitter for Onsite Commercial Staffing from 1927-1999, in Birmingham, Alabama; as a pipefitter and plumber for E. B. Construction Corporation from 1995-1996, in Birmingham, Alabama; as a plumber for Action Plumbing & Heating Inc. in 1995, in Birmingham, Alabama; as a pipefitter for MCC Mechanical Inc. from 1991-1992, in Birmingham, Alabama; as a pipefitter and plumber for Trinity Contractors in 1991, in Birmingham, Alabama; as a pipefitter and plumber for J. E. Campbell in 1991, in Birmingham, Alabama; as a pipefitter and plumber for E. B. Construction Corp. from 1990-1991, in Birmingham, Alabama; as a gasfitter and plumber for Superior Mechanical from 1988-1990, in Birmingham, Alabama; as a pipefitter and plumber for Guin Company Inc. in 1990, in Birmingham, Alabama; as a service repairman for AAA Vending from 1996-1977, in Birmingham, Alabama; as a service technician for Crawford Johnson Co. from 1970-1976, in Birmingham, Alabama; as a ambulance attendant for Mack's Ambulance

9

Service from 1966-1970, in Birmingham, Alabama; as a pipefitter and plumber for American Mechanical from 1986-1987, in Birmingham, Alabama; around furnaces, boilers, turbines, and other industrial equipment in his workplace, which contained significant amounts of asbestos-containing products and materials.

Plaintiff's Decedent died of Lung Cancer as the result of exposure to asbestos and asbestos-containing materials and products, on or about, December 9, 2005. This case is brought by Decedent, James O. Davis's spouse and personal representative Valie Ogles.

4.      Plaintiff **TERESA WATSON**'s Decedent, **SHIRLEY MARIE GILBERT**, a resident of Birmingham, Alabama, prior to her death contracted one or more asbestos-related diseases including *Asbestosis ??*. Decedent was continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout Decedent's husband's employment, and in his environment while employed.

Decedent was married to Harvey B. Byrd, Jr. During the course of his employment, Harvey B. Byrd, Jr. worked, including but not limited to, as an insulator for Air Prod. & Chemical from 1960-1980, in Pace, Florida; as an insulator for C.A. Carroll Construction from 1960-1980, in Milton, Florida; around furnaces, boilers, turbines, and other industrial equipment in his workplace, which contained significant amounts of asbestos-containing products and materials. During the course of Decedent Shirley Marie Gilbert's marriage to Harvey B. Byrd, Jr., Decedent was exposed to and inhaled the asbestos fibers from each Defendants' products brought home on her husband's work clothes and in the course of doing her husband's laundry.

Plaintiff's Decedent died of *Asbestosis??* as the result of exposure to asbestos and asbestos-containing materials and products, on or about, December 30, 2005. This case is brought by Decedent, Shirley Marie Gilbert's daughter and personal representative Teresa Watson.

5.    Plaintiff **MOLLIE GRESHAM**'s Decedent, **ARCHIE L. GRESHAM, SR.**, a resident of Birmingham, Alabama, prior to his death contracted one or more asbestos-related diseases including Lung Cancer. Decedent was continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout his employment, and in his environment while employed.

During the course of his employment, Decedent Archie L. Gresham, Sr. worked, including but not limited to, as a painter for Vulcan Signs & Stamp from 1969-1975, in Birmingham, Alabama; in the United States Army from 1950-1952; as a laborer for the City of Adamsville from 1976-1993, in Adamsville, Alabama; around furnaces, boilers, turbines, and other industrial equipment in his workplace, which contained significant amounts of asbestos-containing products and materials.

Plaintiff's Decedent died of Lung Cancer as the result of exposure to asbestos and asbestos-containing materials and products, on or about, December 24, 2005. This case is brought by Decedent, Archie L. Gresham, Sr.'s spouse and personal representative Mollie Gresham.

6.    Plaintiff **JANNIE HICKS**'s Decedent, **WILLIE HICKS**, a resident of Gainesville, Alabama, prior to his death contracted one or more asbestos-related diseases including Esophageal Cancer. Decedent was continually exposed to asbestos-containing

11

products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout his employment, and in his environment while employed.

During the course of his employment, Decedent Willie Hicks worked, including but not limited to, as a cement finisher for Curtis Concrete Co. from 1960-1965, in Tuscaloosa, Alabama; as an equipment operator for Greenfield Construction from 1970-1974, in Detroit, Michigan; as a plumber for Dan Walker Plumbing from 1958-1959, in Tuscaloosa, Alabama; as a laborer for BOP Steel from 1967-1971, in Detroit, Michigan; as a laborer for CA Hull Construction from in the 1960's, in Detroit, Michigan; around furnaces, boilers, turbines, and other industrial equipment in his workplace, which contained significant amounts of asbestos-containing products and materials.

Plaintiff's Decedent died of Esophageal Cancer as the result of exposure to asbestos and asbestos-containing materials and products, on or about, November 14, 2006. This case is brought by Decedent, Willie Hicks's spouse and personal representative Jannie Hicks.

7.      Plaintiff **PAULINE M. MATTHEWS**, a resident of Florence, Alabama, contracted one or more asbestos-related diseases including Throat Cancer. Plaintiff was continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout her employment, and in her environment while employed.

During the course of her employment, Plaintiff Pauline M. Matthews worked, including but not limited to, as an inspector for Janesco from 1958-1979, in Florence, Alabama; as a press operator for Tennessee Valley Laundry in 1957 in Florence, Alabama;

around furnaces, boilers, turbines, and other industrial equipment in her workplace, which contained significant amounts of asbestos-containing products and materials.

Plaintiff was married to R.T. Matthews. During the course of his employment, R.T. Matthews worked, including but not limited to, as a cable mill worker for Reynolds Metals from 1947-1949, in Muscle Shoals, Alabama; around furnaces, boilers, turbines, and other industrial equipment in his workplace, which contained significant amounts of asbestos-containing products and materials. During the course of Plaintiff Pauline M. Matthew's marriage to R.T. Matthews, Plaintiff was exposed to and inhaled the asbestos fibers from each Defendants' products brought home on her husband's work clothes and in the course of doing her husband's laundry.

Plaintiff Pauline M. Matthews was diagnosed with asbestos-related disease.

8.    Plaintiff **BOBBIE PRENTICE**, a resident of Hamilton, Alabama, contracted one or more asbestos-related diseases including Lung Cancer. Plaintiff was continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout her employment, and in her environment while employed.

During the course of her employment, Plaintiff Bobbie Prentice worked, including but not limited to, as a sewing machine operator for Munsing Wear from 1957-1990, in Guin, Alabama; as a sewing machine operator for Healthtex from 1970-1977, in Guin, Alabama; around furnaces, boilers, turbines, and other industrial equipment in her workplace, which contained significant amounts of asbestos-containing products and materials.

Plaintiff Bobbie Prentice was diagnosed with asbestos-related Lung Cancer.

13

9.    Plaintiff **PATSY W. MIBUS**'s Decedent, **CHARLES WEBB**, a resident of London, Kentucky, prior to his death contracted one or more asbestos-related diseases including Lung Cancer.   Decedent was continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by defendants as specified herein throughout his employment, and in his environment while employed.

During the course of his employment, Decedent Charles Webb worked, including but not limited to, as a heavy equipment operator for Greer Bros. in London, Kentucky; as a mechanic for 4M Coal from in the 1970's, in London, Kentucky; as a mechanic for Mountain Clay Coal from in the 1980's, in London, Kentucky; as a mechanic for Interstate Coal in London, Kentucky; as a mechanic for Komatasu Reman from 1996-2001, in Lexington, Kentucky; as a service technician for KU Electric from 2001-2005, in London, Kentucky; around furnaces, boilers, turbines, and other industrial equipment in his workplace, which contained significant amounts of asbestos-containing products and materials.

Plaintiff's Decedent died of Lung Cancer as the result of exposure to asbestos and asbestos-containing materials and products, on or about, December 4, 2005. This case is brought by Decedent, Charles Webb's spouse and personal representative Patsy W. Mibus.

10.    Plaintiff **BEVERLY AGEE**'s Decedent, **YON WIGGINS**, a resident of Birmingham, Alabama, prior to his death contracted one or more asbestos-related diseases including Lung Cancer.   Decedent was continually exposed to asbestos-containing products, produced, manufactured, specified for use, installed, distributed, sold and/or

placed into the stream of commerce by defendants as specified herein throughout his employment, and in his environment while employed.

During the course of his employment, Decedent Yon Wiggins worked, including but not limited to, as a machinist for Hardie Tynes Manufacturing from 1951-1994, in Birmingham, Alabama; around furnaces, boilers, turbines, and other industrial equipment in his workplace, which contained significant amounts of asbestos-containing products and materials.

Plaintiff's Decedent died of Lung Cancer as the result of exposure to asbestos and asbestos-containing materials and products, on or about, February 20, 2007. This case is brought by Decedent, Yon Wiggins's daughter and personal representative Beverly Agee.

## BACKGROUND FACTS — THE DEFENDANTS

11.    The Plaintiffs adopts, alleges, and incorporates herein by reference all of the averments and allegations set forth in the preceding paragraphs of this complaint as if fully set forth herein.

12.    The term "Producer Defendant" refers to each and every one of those defendants which produced and/or manufactured asbestos-containing products and/or materials and placed the asbestos-containing products and/or materials into the stream of commerce.

13.    The following defendants are "Producer Defendants". (The asbestos-containing products produced by each defendant that have been identified at plaintiffs workplace, during his employment years there, are set out hereinbelow).

15

14. **ALBANY INTERNATIONAL** is a New York corporation whose principal place of business is 1373 Broadway, Albany, New York 12204.

- Asbestos containing products, including but not limited to Paper Machine Clothing.

15. **ALLIS-CHALMERS CORPORATION PRODUCT LIABILITY TRUST,** is a Delaware Corporation whose principle place of business is 1126 South 70th Street, West Allis, Wisconsin, 53214.

16. **AMERICAN OPTICAL CORPORATION** is a Delaware corporation whose principal place of business is 100 Merchanic Street, Southbridge, Massachusetts 01550.

- Protective covering.

17. **AMERICAN STANDARD, INC.** is a Delaware corporation whose principal place of business is One Centennial Avenue, Piscataway, New Jersey 08855.

- Asbestos containing products, including but not limited to Air Conditioning Systems;

- Asbestos containing products, including but not limited to Plumbing Products;

- Asbestos containing products, including but not limited to Automotive Breaking Systems.

18. **ANCHOR PACKING COMPANY** is a Delaware Corporation whose principal place of business is One Buttonwood Square, Philadelphia, Pennsylvania, 19130.

- Packing.

19. **ARVINMERITOR, INC.** is a Nevada Corporation whose principal place of business is 2135 West Maple Road, Troy, Michigan, 48084.

16

- Asbestos containing products, including but not limited to Asbestos brakeshoes;

- Asbestos containing products, including but not limited to Friction materials.

20.    **ASTEN JOHNSON, INC.**, individually and as successor-in-interest to **ASTEN, INC.**, successor-in-interest by way of name change to **ASTEN GROUP, INC.**, formerly trading as **ASTEN-HILLS MANUFACTURING CO.** is a Delaware corporation whose principal place of business is 1013 Centre Road, Wilmington, Delaware 19805.

- Asbestos containing products, including but not limited to Asbestos Felt;

- Asbestos containing products, including but not limited to Bestmesh Felt;

- Asbestos containing products, including but not limited to Calcot Felt;

- Asbestos containing products, including but not limited to Syncot Felt;

- Asbestos containing products, including but not limited to Synbest Felt;

- Asbestos containing products, including but not limited to Thermesh Felt;

- Asbestos containing products, including but not limited to Ventmesh Felt.

21.    **BAYER CROPSCIENCE, INC.**, individual and as successor to **AVENTIS CROPSCIENCE USA, INC.** f/k/a **RHONE-POULENCE AG CO.**, f/k/a **AMCHEM, PRODUCTS, INC.**, **BENJAMIN FOSTER CO.** is a New York corporation whose principal place of business is 600 Madison Avenue, New York, NY 10022.

- Asbestos containing products, including but not limited to Benjamin Foster Products;

- Asbestos containing products, including but not limited to Roofing Products.

22.    **BELL & GOSSETT**, a subsidiary of **ITT INDUSTRIES** is an Indiana corporation whose principal place of business is 4 West Red Oak Lane, White Plains, New York 10604.  8200 N. Austin Avenue, Morton Grove, Illinois 60053.

17

- Asbestos containing products, including but not limited to Compressors.

23.    **BONDEX INTERNATIONAL INC.** is an Ohio corporation whose principal place of business is 20 Casey Street, Gilroy, California 95020.

- Asbestos containing products, including but not limited to Paper Products;

- Asbestos containing products, including but not limited to Drywall Products.

24.    **BORG WARNER CORPORATION** by its successor in interest, **BORGWARNER MORSE TEC INC.** is an Ohio corporation whose principal place of business is 200 S. Michigan Street, Chicago, Illinois 60604.

- Asbestos containing products, including but not limited to Brake Linings (1971 – 1975);

- Asbestos containing products, including but not limited to Clutch Linings (1928 – 1980's).

25.    **BP AMERICA**, as successor in interest to **AMOCO CHEMICAL COMPANY, AMOCO CHEMICALS COMPANY, PLASKON ELECTRONIC MINERALS, AVISUN CORP., CARBORUNDUM, ATLANTIC RICHFIELD COMPANY/ARCO METALS**, as successor in interest to **ANACONDA AMERICAN BRASS COMPANY, AMERICAN BRASS COMPANY, AND ANACONDA COMPANY** is a Delaware corporation whose principal place of business is 200 East Randolph Drive, Chicago, Illinois, 60601

- Asbestos containing products, including but not limited to Grinding products.

26.    **BP AMOCO CHEMICAL COMPANY** is a Delaware corporation whose principal place of business is 200 East Randolph Drive, Chicago, Illinois, 60601.

- Asbestos containing products, including but not limited to Grinding products.

18

27.   **BUFFALO PUMP INC.** is a Delaware corporation whose principal place of business is 874 Oliver Street, North Tonawanda, New York 14120.

- Asbestos containing products, including but not limited to Pumps.

28.   **CERTAINTEED CORPORATION** is a Maryland corporation whose principal place of business is 750 East Swedesford Road, Valley Forge, Pennsylvania 19482.

- Asbestos Cement Sheets (1968 – 1976)

- CertainTeed Asbestos Roof Coating (1930 – 1982)

- CertainTeed Asbestos Cement Pipe (1962 – 1992)

- CertainTeed Cold Process Cement (1940 – 1967)

- CertainTeed Joint Treating Compound (1937 – 1956)

- CertainTeed Plastic Cement (1930 – 1983)

- CertainTeed Sealing Cement (1930 – 1976)

- Wet Seal Plastic Cement (1961 – 1977)

29.   **CLARK-RELIANCE CORPORATION** is a Delaware corporation whose principal place of business is 16633 Foltz Industrial Parkway, Strongsville, Ohio 44149.

- Asbestos containing products, including but not limited to Electric Motors.

30.   **CLEAVER BROOKS**, a division of **AQUA CHEM** is a Wisconsin corporation whose principal place of business is 7800 North 113th Street, Milwaukee, Wisconsin 53201.

- Boilers.

31.   **CONWED CORPORATION** is a Delaware corporation whose principal place of business is 208 S. LaSalle Street, Chicago, Illinois 60604.

19

- Asbestos containing products, including but not limited to Ceiling tiles.

32.    **COOPER INDUSTRIES, LLC, f/n/a COOPER INDUSTRIES, INC.,** individually and as successor-in-interest to **CROUSE-HINDS** is an Ohio corporation whose principal place of business is Wolf & 7th Streets, Syracuse, NY 13221.

- Asbestos containing products, including but not limited to Electrical Products;

- Asbestos containing products, including but not limited to Chico Belden wire and cable;

- Asbestos containing products, including but not limited to Crouse-Hinds electrical products ;

- Asbestos containing products, including but not limited to Chico packing;

- Asbestos containing products, including but not limited to Arrow-Hart electrical products;

- Asbestos containing products, including but not limited to Bussman electrical products;

- Asbestos containing products, including but not limited to Cooper lighting products;

- Asbestos containing products, including but not limited to McGraw-Edson electrical products.

33.    **CRANE CO.,** individually and as successor in interest to **DEMING PUMP, CYCLOTHERM,  HYDRO-AIRE,  LEAR ROMEC, RESISTOFLEX, SWARTWOUT CO., STOCKHAM VALVE COMPANY, WEINMAN PUMP COMPANY, CHEMPUMP,** and **BURKS PUMPS** is an Alaska corporation whose principal place of business is 100 Stamford Place, Stamford, Connecticut 06902.

- Asbestos containing products, including but not limited to Gaskets;

- Asbestos containing products, including but not limited to Hydraulic Packing;

- Asbestos containing products, including but not limited to Ring Packing;

- Asbestos containing products, including but not limited to Rope Packing;

- Asbestos containing products, including but not limited to Yarn.

34.    **CRANE PUMPS & SYSTEMS, INC.,** individually and as successor to all pump companies acquired by **CRANE** is a Delaware corporation whose principal place of business is 420 Third Street, Piqua, Ohio, 45356.

- Asbestos containing products, including but not limited to Pumps;

- Asbestos containing products, including but not limited to Valves.

35.    **CROWN, CORK, & SEAL COMPANY, INC.** is a Delaware corporation whose principal place of business is One Crown Way, Philadelphia, Pennsylvania 19154.

- Mundet Block Insulation (1950's – 1963)

- Mundet Insulating Cement (1950's – 1963)

- Mundet Pipe Covering (1950's – 1963)

- Pipe Covering

- Block Insulation.

36.    **CROWN HOLDINGS, INC.,** successor-in-interest to **MUNDET CORK CORP.** is a Delaware corporation whose principal place of business is One Crown Way, Philadelphia, PA 19154.

- Mundet Block Insulation (1950's – 1963)

- Mundet Insulating Cement (1950's – 1963)

- Mundet Pipe Covering (1950's – 1963)

21

- Pipe Covering

- Block Insulation.

37.     **CUTLER HAMMER,** currently referred to as **EATON ELECTRICAL, INC.** is a Delaware corporation whose principal place of business is 4201 N. 27th Street, Milwaukee, Wisconsin 53216.

- Electrical Products.

38.     **D. B. RILEY, INCORPORATE,** is a Massachusetts corporation whose principal place of business is 9 Neponset Street, Worcester, Massachusetts, 01606.

- Boilers.

39.     **EATON CORPORATION** is a Delaware corporation whose principal place of business is 1209 Orange Street, Wilmington, Delaware 19801.

- Asbestos containing products, including but not limited to Industrial Automation Products.

40.     **EMERSON ELECTRIC CO.** is a Missouri corporation whose principal place of business is 8000 W. Florissant Avenue, Saint Louis, Missouri 63136.

- Asbestos containing products, including but not limited to Motors;

- Asbestos containing products, including but not limited to Starters;

- Asbestos containing products, including but not limited to Electrical Products.

41.     **EXTECO, INC.,** f/k/a **THERMO ELECTRIC CO., INC.** is a Delaware corporation whose principal place of business is 109 North 5th Street, Saddle Brook, New Jersey 07663.

- Asbestos containing products, including but not limited to Electrical Wire.

42.    **FLAME REFRACTORIES, INC.** is a Florida Corporation whose principal place of business is 22466 Flame Road, Oakboro, NC 28129.

- Asbestos containing products, including but not limited to Hot Top Refractories.

43.    **FMC CORPORATION**, individually and on behalf of its former **CONTRUCTION EQUIPMENT GROUP**, and former **PEERLESS PUMP DIVISION**, **COFFIN TURBO PUMPS**, and **CHICAGO PUMP**, business is a Delaware corporation whose principal place of business is 200 E. Randolph Drive, Chicago, Illinois 60601.

- Asbestos containing products, including but not limited to Pumps;

- Asbestos containing products, including but not limited to Valves;

- Asbestos containing products, including but not limited to Cranes.

44.    **FOSECO, INC.** is a New York corporation whose principal place of business is 277 Park Avenue, New York, New York 10017.

- Asbestos containing products, including but not limited to "Hot Tops" Insulating cements.

45.    **GARLOCK SEALING TECHNOLOGIES L.L.C.** is a Delaware corporation whose principal place of business is 1666 Division Street, Palmyra, New York 14522.

- Asbestos containing products, including but not limited to Asbestos Cloth (1907 – 1980);

- Asbestos containing products, including but not limited to Gaskets (1907 – 1980);

- Asbestos containing products, including but not limited to Packing (1907 – 1980);

- Asbestos containing products, including but not limited to Ring Packing (1907 – 1980);

- Asbestos containing products, including but not limited to Rope Packing (1907 –
1980);

- Asbestos containing products, including but not limited to Sheet Packing (1907 –
1980);

- Asbestos containing products, including but not limited to Sheet Gaskets (1907 –
1980);

- Asbestos containing products, including but not limited to Valve Packing (1907 –
1980).

46.    **GENERAL ELECTRIC CO.** is a New York corporation whose principal
place of business is 1 River Road, Schnecectady, New York 12301.

- Asbestos containing products, including but not limited to Cable;

- Asbestos containing products, including but not limited to Furnaces;

- Asbestos containing products, including but not limited to Turbines;

- Asbestos containing products, including but not limited to Wire;

- Asbestos containing products, including but not limited to Welding Electrodes;

- Asbestos containing products, including but not limited to Welding Machines.

47.    **GEORGIA-PACIFIC CORPORATION** is a Georgia corporation whose
principal place of business is 133 Peachtree Street, N.E., Atlanta, Georgia 30303.

- Acoustical Plaster (1950's – 1974)

- All Purpose Joint Compound (1967 – 1977)

- Bedding Compound (1956 – 1977)

- Dry Mixed Joint Compound (1956 – 1977)

- Drywall Adhesive (1972)

24

- Joint Compound (1956 – 1977)

- Kalite (1956 – 1959)

- Laminating Compound (1969)

- Lite Acoustical Plaster (1958 – 1964)

- Patching Plaster (1956 – 1976)

- Ready Mix Joint Compound (1963 – 1977)

- Roof Coating (1975 - ?)

- Spackling Compound (1956 – 1971)

- Speed Set Joint Compound (1962 – 1974)

- Texture (1956 – 1974)

- Topping Compound (1956 – 1977)

- Triple Duty Joint Compound (1956 – 1977.

48.    **GOODYEAR TIRE AND RUBBER CO.** is a Delaware corporation whose principal place of business is 1144 E. Market Street, Akron, Ohio  44316.

- Asbestos containing products, including but not limited to Gaskets.

49.    **GOULDS PUMPS INC.** is a Delaware corporation whose principal place of business is 300 Willow Block Office Park, Fairport, New York 14450.

- Asbestos containing products, including but not limited to ITE electrical products including breakers

- Asbestos containing products, including but not limited to Century motors.

50.    **GUARD-LINE, INC.** is a Texas corporation whose principal place of business is 215 S. Louise Street, Atlanta, Texas  75551.

- Protective Clothing.

51.    **HOBART BROTHERS COMPANY** is an Ohio corporation whose principal place of business is 3600 W. Lake Avenue, Glenview, Illinois 60025-5811.

- Asbestos containing products, including but not limited to Welding Products

- Asbestos containing products, including but not limited to Welding Flux;

- Asbestos containing products, including but not limited to Welding Electrodes;

- Asbestos containing products, including but not limited to Welding Machines;

- Asbestos containing products, including but not limited to Welding Rods.

52.    **IMO INDUSTRIES, INC.,** is an Delaware corporation whose principal place of business is 8730 Stony Point Parkway, #150, Richmond, Virginia, 23235.

- Asbestos containing products, including but not limited to Turbines.

53.    **INDUSTRIAL HOLDINGS CORPORATION,** f/k/a **THE CARBORUNDUM COMPANY** is a New York corporation whose principal place of business is 101 Hudson Street, Jersey City, New Jersey 07302.

- Asbestos containing products, including but not limited to Grinding Mills.

54.    **INGERSOLL-RAND COMPANY** is a New Jersey corporation whose principal place of business is 200 Chestnut Ridge Road, Woodcliff, New Jersey 070677.

- Asbestos containing products, including but not limited to Air Compressors;

- Asbestos containing products, including but not limited to Impact Wrenches;

- Asbestos containing products, including but not limited to Blowers;

- Asbestos containing products, including but not limited to Industrial Products;

- Asbestos containing products, including but not limited to Pumps.

55.    **ITT INDUSTRIES INC.** is an Indiana corporation whose principal place of business is 4 West Red Oak Lane, West Plains, New York 10604.

26

- Asbestos containing products, including but not limited to Compressors.

56.    **JOHN CRANE, INC.**, f/k/a **JOHN CRANE PACKING COMPANY** is a Delaware corporation whose principal place of business is 6400 West Oakton Street, Morton Grove, Illinois 60053.

- Asbestos containing products, including but not limited to Gaskets;

- Asbestos containing products, including but not limited to Packing.

57.    **KAISER GYPSUM COMPANY, INC.** is a Washington corporation whose principal place of business is P. O. Box 8019 Walnut Creek, California 94596.

- Asbestos containing products, including but not limited to Cover-Tex Wall Texture;

- Asbestos containing products, including but not limited to Dual Purpose Joint Compound;

- Asbestos containing products, including but not limited to Finishing Compound;

- Asbestos containing products, including but not limited to Joint Compound;

- Asbestos containing products, including but not limited to Kaiser Mineral Fiberboard;

- Asbestos containing products, including but not limited to K-Spray Ceiling Texture (1961 – 1975);

- Asbestos containing products, including but not limited to Masonry Cement;

- Asbestos containing products, including but not limited to Null-A-Fire Board (1969 – 1978);

- Asbestos containing products, including but not limited to One-Day Joint Compound;

- Asbestos containing products, including but not limited to Plastic Cement;

- Asbestos containing products, including but not limited to Plastic Cement;

- Asbestos containing products, including but not limited to Plastic Gun Cement;

- Asbestos containing products, including but not limited to Premix Finishing
  Compound.

58.    **KELLY-MOORE PAINT COMPANY, INC.** is a California corporation
whose principal place of business is 987 Commercial Street, San Carlos, California 94070.

- Asbestos containing products, including but not limited to Bedding Cement (1960 –
  1970);

- Asbestos containing products, including but not limited to Deco-Tex Ceiling
  Texture (1964 – 1978);

- Asbestos containing products, including but not limited to Paco All-Purpose Joint
  Compound (1960 – 1978);

- Asbestos containing products, including but not limited to Paco Finishing
  Compound (1960 – 1977);

- Asbestos containing products, including but not limited to Paco Joint Cement;

- Asbestos containing products, including but not limited to Paco Joint Compound
  (1960 – 1978);

- Asbestos containing products, including but not limited to Paco Quik-Set Joint
  Compound (1963 – 1978);

- Asbestos containing products, including but not limited to Paco Ready Mix Joint
  Compound (1963 – 1978);

- Asbestos containing products, including but not limited to Paco Spray Texture;

- Asbestos containing products, including but not limited to Paco Taping Compound (1970 – 1977);

- Asbestos containing products, including but not limited to Paco Texture;

- Asbestos containing products, including but not limited to Paco Texture Paint;

- Asbestos containing products, including but not limited to Paco Topping Compound (1963 – 1977);

- Asbestos containing products, including but not limited to Paco Wall Texture (1960 – 1978);

- Asbestos containing products, including but not limited to Paco-Tex Wall Texture.

59.    **KOPPERS INDUSTRIES** is a Pennsylvania corporation whose principal place of business is 1750 Kopper Building, 437 7th Avenue, Pittsburgh, Pennsylvania 15219.

- Coke Batteries

- Roofing Materials.

60.    **THE LINCOLN ELECTRIC COMPANY** is an Ohio _____ corporation whose principal place of business is 22801 St. Clair Avenue, Cleveland, Ohio 44114.

- Asbestos containing products, including but not limited to Welding Rods;

- Asbestos containing products, including but not limited to Welding Flux.

61.    **MAREMONT CORPORATION** is an Illinois corporation whose principal place of business is One Noblitt Plaza, Columbus, Indiana 47202.

- Asbestos containing products, including but not limited to Brake Linings;

- Asbestos containing products, including but not limited to Brake Shoes.

62.    **METROPOLITAN LIFE INSURANCE COMPANY** is a New York corporation whose principal place of business is 1 Madison Avenue, New York, New York 10010.

- Insurance company.

63.    **MOBIL OIL** is a New York corporation whose principal place of business is 5959 Law Colinas Boulevard, Irving, Texas, 75039.

- Caulking Compounds.

64.    **OGLEBAY NORTON COMPANY,** is a Delaware corporation whose principal place of business is North Point Tower, 1001 Lakeside Avenue, 15th Floor, Cleveland, Ohio, 44114.

- Asbestos containing products, including but not limited to Hot Top Refractories.

65.    **OWENS-ILLINOIS, INC.** is a Delaware corporation whose principal place of business is One Segate Tax 5, Toledo, Ohio 43666.

- Asbestos containing products, including but not limited to Kaylo Block Insulation
   (1944 – 1958);

- Asbestos containing products, including but not limited to Kaylo Pipe Covering
   (1944 – 1958).

66.    **P&H CRANES** is a Wisconsin corporation whose principal place of business is 4400 W. National Avenue, Milwaukee, Wisconsin 53201.

- Cranes.

67.    **PNEUMO ABEX LLC,** successor in interest to **ABEX CORPORATION** is a Delaware corporation whose principal place of business is One Liberty Lane, Hampton, New Hampshire 03842.

- Asbestos containing products, including but not limited to Industrial Automotive;

- Asbestos containing products, including but not limited to Aerospace Segments.

68.     **RAPID AMERICAN CORPORATION** is a Delaware corporation whose principal place of business is 888 Seventh Avenue, New York, New York 10106.

- Asbestos containing products, including but not limited to Cements;

- Asbestos containing products, including but not limited to Pipe Covering.

69.     **RILEY INC., f/k/a BABCOCK BORSIG POWER INC., a/k/a RILEY STOKER CORPORATION** is a Massachusetts corporation whose principal place of business is 5 Neponset Street, Worcester, Massachusetts 01606.

- Steam & Fuel Burning Equipment

- Boilers

- Steam Generators

- Desuperheaters

- Waste Heat Boilers.

70.     **ROCKBESTOS-SURPRENANT CABLE CORPORATION**, f/k/a **THE ROCKBESTOS COMPANY** is a Delaware corporation whose principal place of business is 172 Sterling Street, Clinton, Massachusetts 01510.

- Cable and Wire (1918 – 1986).

71.     **ROCKWELL AUTOMATION**, successor by merger to **ALLEN-BRADLEY CO., LLC** is a Delaware corporation whose principal place of business is 777 E. Wisconsin Avenue, Suite 1400, Milwaukee, Wisconsin 53202.

- Pumps

- Valves.

72.    **SCHNEIDER ELECTRIC INDUSTRIES, S.A.S., NORTH AMERICAN DIVISION** is a Pennsylvania corporation whose principal place of business is 118 Poplar Street, Ambler, Pennsylvania 19002.

- Breakers

- Terminals.

73.    **SEPCO CORPORATION** is a Pennsylvania corporation whose principal place of business is 322 Thomson Park Drive, Cranberry, Pennsylvania, 16066-6430.

- Gaskets

- Packing.

74.    **SQUARE D COMPANY** is a Delaware corporation whose principal place of business is 1415 South Roselle Road, Palatine, Illinois 60067.

- Asbestos containing products, including but not limited to Electrical Products;

- Asbestos containing products, including but not limited to Braker Boxes;

- Asbestos containing products, including but not limited to Braker Panels;

- Asbestos containing products, including but not limited to Crane Brakes.

75.    **SUNBEAM PRODUCTS INCORPORATED,** fka **SUNBEAM CORPORATION** is a Delaware corporation whose principal place of business is 100 West Tenth Street, Wilmington, Delaware, 19801.

- Asbestos containing products, including but not limited to Furnaces.

76.    **SURFACE COMBUSTION** is an Ohio corporation whose principal place of business is 2375 Dorr Street, Toledo, Ohio, 43607.

- Asbestos containing products, including but not limited to Furnaces.

32

77.    **TH AGRICULTURE & NUTRITION, LLC** is a Delaware corporation whose principal place of business is100 W. 10th Street, Wilmington, Delaware 19801.

- Asbestos containing products, including but not limited to Fiber.

78.    **THE MARLEY-WYLAIN COMPANY**, d/b/a **WELL-MCLAIN COMPANY, INC.** is an Iowa corporation whose principal place of business is 1900 Shawnee Mission Parkway, Mission Woods, Kansas 66205.

- Asbestos containing products, including but not limited to Boilers;

- Asbestos containing products, including but not limited to Fuel Oil Heaters.

79.    **THIEM CORPORATION**, successor by merger to **UNIVERSAL REFRACTORIES CORP.** is a New York corporation whose principal place of business is 436 Seventh Avenue, Pittsburg, Pennsylvania 15219.

80.    **UNION CARBIDE CORPORATION** is a New York corporation whose principal place of business is 335 Madison Avenue, New York, NY 10017.

- Asbestos containing products, including but not limited to Asbestos containing products, Bakelite Panels (1939 – 1974);

- Asbestos containing products, including but not limited to Panelboard (1939 – 1974);

- Asbestos containing products, including but not limited to Calidria – Raw Fiber;

- Asbestos containing products, including but not limited to Welding Flux.

81.    **UNIROYAL FIBER & TEXTILE DIVISION OF UNIROYAL, INC.** is a New Jersey corporation whose principal place of business is 70 Great Hill Road, Naugatuck, Connecticut, 06770.

- Asbestos containing products, including but not limited to Asbestos cloth.

82.    **USX CORPORATION** as successor in interest to **UNITED STATES STEEL, LLC,** formerly known as **TENNESSEE COAL AND IRON** is a Delaware corporation whose principal place of business is 600 Grant Street, Pittsburgh, Pennsylvania, 15219.

- Wire & cable

- Premise liability.

83.    **VIACOM INC.,** successor by merger to **CBS CORPORATION** f/k/a **WESTINGHOUSE ELECTRIC CORPORATION** is a Delaware corporation whose principal place of business is 1515 Broadway, New York, New York 10036

- Asbestos containing products, including but not limited to all kinds of electrical products;

- Asbestos containing products, including but not limited to Wire;

- Asbestos containing products, including but not limited to Cable;

- Asbestos containing products, including but not limited to Gaskets;

- Asbestos containing products, including but not limited to Packing;

- Asbestos containing products, including but not limited to Panels;

- Asbestos containing products, including but not limited to Paper;

- Asbestos containing products, including but not limited to Turbines;

- Asbestos containing products, including but not limited to Transformers;

- Asbestos containing products, including but not limited to Terminals;

- Asbestos containing products, including but not limited to Breakers;

- Asbestos containing products, including but not limited to Motors;

- Asbestos containing products, including but not limited to Micarta;

- Asbestos containing products, including but not limited to Welding Rods;

- Asbestos containing products, including but not limited to Welding Electrodes;

- Asbestos containing products, including but not limited to Welding Machines.

84.    **WARREN PUMPS, INC.** is a Massachusetts corporation whose principal place of business is 82 Bridges Avenue, Warren, Pennsylvania, 01083-0969.

- Pumps.

85.    **ZURN INDUSTRIES, INC.** is a Pennsylvania corporation whose principal place of business is 1801 Pittsburgh Avenue, Erie, Pennsylvania 16514.

- Pumps

- Valves.

86.    The term "Specifying Defendant" refers to each and every one of those defendants which specified the use of asbestos-containing products and/or materials on equipment, including both equipment it produced, manufactured, distributed, sold, and/or placed into the stream of commerce and equipment produced, manufactured, distributed, sold and/or placed into the stream of commerce by others.

87.    The following defendant is a "Specifying Defendants", a "Producer Defendants" and a "Premise Defendant":

88.    **UNITED STATES STEEL CORPORATION** is a corporation whose principal place of business is 600 Grant Street, Pittsburgh, PA  15219

- Wire & cable

35

- Premise Liability.

89.    The term "Distributor Defendant" refers to each and every one of those defendants which distributed, sold and/or placed into the stream of commerce asbestos-containing products and/or materials, including both their own asbestos-containing products and/or materials and asbestos-containing products and/or materials produced or manufactured by others.

90.    **NATIONAL SERVICE INDUSTRIES, INC.,** f/k/a **NORTH BOTHERS, INC.** is a Georgia corporation whose principal place of business is 1420 Peachtree Street, N.E., Atlanta, Georgia 30309.

- Insulation contracting company

91.    The term "Contractor Defendant" refers to each and every one of those defendants which installed asbestos-containing products and/or materials at the worksites, including both their own asbestos-containing products and/or materials and asbestos-containing products and/or materials produced or manufactured by others.

92.    The following defendant is both a "Specifying Defendants" and a "Contractor Defendants":

93.    **BECHTEL CONSTRUCTION COMPANY** is a Nevada Corporation whose principal place of business is 50Beale Street, San Francisco, California, 94105.

94.    The following defendant is both a "Producer Defendant" and a "Contractor Defendant":

95.    **FOSTER-WHEELER CORPORATION** is a New York corporation whose principal place of business is 110 Lookerman Square, Dover, Delaware 19904.

- Asbestos containing products, including but not limited to Boilers;

36

- Asbestos containing products, including but not limited to Contract Units;

- Asbestos containing products, including but not limited to Appartemart Boiler Parts;

96.    The following defendants are both "Distributor Defendants" and "Contractor Defendants":

97.    **HONEYWELL, INC.**, specifically excluding liability for **NARCO**, individually and as successor to **ALLIED SIGNAL, BENDIX, WHEELABRATOR, RUST ENGINEERING**, AND **ALLIED CHEMICAL** is a Delaware corporation whose principal place of business is Honeywell Plaza, Minneapolis, Minnesota 55408.

- Asbestos containing products, including but not limited to Pumps and Valves;

- Asbestos containing products, including but not limited to Electrical Products (controls, wires, etc.).

- Asbestos containing products, including but not limited to Contractor liability defendant.

98.    Each defendant is sued (a) in its individual capacity, (b) as a successor in interest to each of those entities specifically identified herein as the Defendant's predecessor in interest, (c) as a successor in interest to each of those entities which, through discovery or otherwise, is identified during the course of litigation as the Defendant's predecessor in interest, (d) as an alter ego to each of those entities specifically identified herein as the Defendant's adjunct or instrumentality, and (e) as an alter ego to each of those entities which, through discovery or otherwise, is identified during the course of litigation as the Defendant's adjunct or instrumentality.

## DEFENDANTS' CONDUCT AND PLAINTIFF'S DECEDENT'S INJURY

99.    The Plaintiff adopts, alleges, and incorporates herein by reference all of the

averments and allegations set forth in the preceding paragraphs of this complaint as if fully set forth herein.

100.  The Defendants acted by and through their agents, servants, and employees, and are liable for the conduct of their agents, servants, and employees. Whenever this complaint refers to Defendants' actionable conduct, it includes the conduct of Defendants' agents, servants, and employees.

101.  Whenever this complaint refers to asbestos-containing products and/or materials, it includes, without limitation, all products and/or materials containing any amount of any form of asbestos and/or any form of talc.

102.  The Defendants, at all times relevant to this complaint, knew, or in the exercise of ordinary care should have known, that asbestos was poisonous and harmful to human beings and that asbestos-containing products and/or materials posed a serious health hazard to humans, particularly in connection with the human lungs and respiratory system but also in connection with other vital organs.

103.  Plaintiffs and/or Plaintiffs' Decedents were injured and/or died as a direct and proximate consequence of the conduct of the Defendants, which were negligent in some or all of the following respects:

A.  Producing and/or manufacturing and placing into the stream of commerce asbestos-containing products and/or materials.

B.  Distributing, selling, and/or placing into the stream of commerce asbestos-containing products and/or materials, including their own asbestos-containing products and/or materials and asbestos-containing products and/or materials produced or manufactured by others.

38

C.    Installing asbestos-containing products and/or materials at the Worksites, including both their own asbestos-containing products and/or materials produced or manufactured by others.

D.    Specifying the use of asbestos-containing products and/or materials on equipment, including both, equipment produced, manufactured, distributed, sold and/or placed into the stream of commerce by the Defendants,

and on equipment produced, manufactured, distributed, sold, and/or placed into the stream of commerce by others.

E.    Marketing asbestos-containing products and/or materials to industries which Defendants knew, or should have known, would expose workers and their families to dust from such asbestos-containing products and/or materials.

F.    Failing to properly design and manufacture asbestos-containing products and/or materials.

G.    Failing to properly test asbestos-containing products and/or materials before they were released for consumer use.

H.    Failing to develop and to utilize a substitute material for asbestos-containing products and/or materials.

I.    Failing to specify for use on equipment safe substitutes for asbestos-containing products and/or materials.

J.    Failing to timely and adequately warn Plaintiffs Decedent of the dangerous characteristics and serious health hazards associated with secondary exposure to asbestos-containing products and/or materials.

K.    Failing to provide Plaintiffs Decedent's with information as to what

would be reasonably safe and sufficient wearing apparel and proper protective equipment and appliances, if in truth there were any, to protect the Plaintiffs Decedent from being harmed and disabled by secondary exposure to asbestos-containing products and/or materials.

L.    Failing to take precautions to protect Plaintiffs Decedent from exposure to asbestos-containing products and/or materials while Plaintiffs Decedent was an invitee on premises occupied, controlled, and/or owned by the Defendants.

M.    Failing to place timely and adequate health warnings on the containers of asbestos-containing products and/or materials, and/or on the asbestos-containing products and/or materials themselves, and/or on equipment requiring or calling for the use of asbestos-containing products and/or materials.

N.    Failing to take reasonable precautions or to exercise reasonable care to publish, to adopt, and to enforce a safety plan and/or safe method of handling and installing asbestos-containing products and/or materials.

O.    Failing to recall and/or to remove from the stream of commerce asbestos-containing products and/or materials despite knowledge of their unsafe and dangerous nature.

P.    Engaging in a conspiracy or conspiracies to affirmatively misrepresent and/or to suppress material facts about the dangers of exposure to asbestos fibers and the seriousness of the health hazard posed by asbestos fibers.

Q.    Specifically disregarding the safety of Plaintiffs Decedent and fraudulently concealing from Plaintiffs Decedent the dangerous nature of the asbestos fibers to which Plaintiffs Decedent was exposed.

R.    Otherwise (a) causing and/or contributing to cause Plaintiffs Decedent

40

to be exposed to asbestos-containing products and/or materials and/or (b) failing to prevent Plaintiffs Decedent from being secondarily exposed to asbestos-containing products and/or materials.

104.    The Defendants' actions were negligent, reckless, and willful and wanton and constituted an outrageous disregard for the health and safety of workers and their families, including Plaintiffs Decedent, who was exposed to asbestos-containing products and/or materials in his workplace.

## COUNT ONE

### Alabama Extended Manufacturer's Liability Doctrine

105.    The Plaintiff adopts, alleges, and incorporates herein by reference all of the averments and allegations set forth in the preceding paragraphs of this complaint as if fully set forth herein.

106.    The initial cause of action for personal injury and wrongful death is grounded in the Alabama Extended Manufacturer's Liability Doctrine.

107.    The asbestos-containing products and/or materials to which Plaintiffs Decedent was exposed were unreasonably dangerous when applied to their intended use in the usual and customary manner in that:

A.    The asbestos fibers contained in the asbestos-containing products and/or materials are highly carcinogenic and otherwise injurious to the tissue of the human body when inhaled into the respiratory system or ingested into the digestive system.

B.    The asbestos fibers contained in the asbestos-containing products and/or materials are fibrous by nature and increase in friability with exposure to heat or friction or by mere passage of time, so that such asbestos fibers are subject to being readily

inhaled or ingested into the respiratory and digestive systems of person in the vicinity thereof.

108.    The Defendants caused the unreasonably dangerous asbestos-containing products and/or materials to enter the market, as a result of which Plaintiffs Decedent was exposed and suffered grave and progressive bodily injuries and death.

109.    The Defendants knew or should have known in the exercise of ordinary care and diligence that the asbestos-containing products and/or materials were unreasonably dangerous. Nevertheless, the Defendants made no effort to recall the asbestos-containing products and/or materials from any buildings, including, without limitation, the Worksites. The Defendants thus allowed Plaintiffs Decedent to be exposed to the asbestos-containing products and/or materials without warning of the dangers thereof or taking preventive measures to protect Plaintiffs Decedent from asbestos exposure, as a proximate result of which Plaintiff's Decedent suffered grave and progressive bodily injury and death.

## COUNT TWO

### Negligence and Intentional Tort

110.    The Plaintiff adopts, alleges, and incorporates herein by reference all of the averments and allegations set forth in the preceding paragraphs of this complaint as if fully set forth herein.

111.    The second cause of action for personal injury and wrongful death is grounded in legal theories of negligence and intentional tort.

112.    The Defendants acted tortiously in concert with one another, and in some instances, intentionally, to advance, to pursue or to implement agreements concerning the misrepresentation, concealment, and/or destruction of scientific and legal evidence

42

concerning the health hazards of asbestos.

113.    The Defendants reached an agreement or understanding to inflict a wrong against Plaintiffs Decedent and other similarly situated individuals. Moreover, the Defendants' minds met on the object or course of action, amounting to some mutual mental action coupled with an intent to commit the acts which resulted in the injuries and death to Plaintiffs Decedent. In short, the Defendants hatched a preconceived plan with unity of design and purpose to misrepresent, conceal and/or destroy scientific and/or legal evidence concerning the health hazards of asbestos. They intended to engage in a course of conduct which resulted in injuries, and the course of conduct was known to them through their officers, directors, agents, servants, and managers.

114.    The Defendants' liability is joint for all of the tortious conduct and resultant injuries, as well as for the wanton behavior of each Defendant, including the wantonness of co-conspirators not sued herein.

115.    The Defendants acted in concert along with other co-conspirators not sued herein with the intent to deceive and to misinform Plaintiffs Decedents and others about the health hazards of asbestos.

116.    Plaintiffs Decedents and others similarly situated were the targets of the intentional acts of deception and misrepresentation.

117.    In particular, the Defendants, acting through their own medical departments and in conjunction with those of their co-conspirators, including their trade associations, investigated the health hazards faced by workers, thereby learning, or in the exercise of reasonable care, having to learn, of the hazards of asbestos.

118.    Acting maliciously, the Defendants initially suppressed and misrepresented

the results of investigations, actively concealing the information from customers, from the users of the asbestos-containing products and/or materials, from their own workers, from the employees of contractors working upon their premises, and from governmental and medical authorities. Ultimately, however, the Defendants conspired to destroy or to alter records of knowledge in order to prevent the scientific and medical evidence from being discovered by the victims of their conspiracy and to forestall regulatory efforts and legislation intended to protect innocent workers from the invisible dusty death.

119. Each Defendant either, (a) actively took part in the suppression, concealment, misrepresentation, and eventual destruction of data and evidence, and/or (b) furthered the plan or plans by cooperation, and/or (c) lent aid or encouragement to the actual wrongdoers, and/or (d) ratified and adopted the wrongdoers' acts done for their benefit.

120. The acts of the Defendants in furtherance of their plan of deception were done intentionally or negligently, and in concert, rendering them each jointly and severally liable for the wanton behavior of the other Defendants and coconspirators not sued herein with whom they acted in concert.

121. As a result of the conspiratorial acts described above, the dangers of asbestos to the human respiratory and digestive systems were hidden from industry in particular and society in general, with the consequences (a) that asbestos-containing products and/or materials were installed in virtually every plant and building in the United States and a large part of the rest of the industrialized world, (b) that safe substitutes were not developed by industry until after plants and buildings had already been made hazardous by the application or installation of numerous asbestos-containing products and/or materials, and (c) that a large number of people who have come into contact with asbestos-containing products and/or

materials have become ill or died as a result of the inhalation or ingestion of asbestos fibers.

122.    Plaintiffs Decedent was among those who worked in the hidden danger of asbestos, sometimes unaware of the presence of asbestos and always unaware of the carcinogenic and other adverse properties of asbestos fibers. As a proximate consequence of the conspiratorial acts of the Defendants in affirmatively misrepresenting and/or suppressing evidence concerning the carcinogenic and other adverse properties of the asbestos-containing products and/or materials, some of which were installed in or applied to the Worksites, Plaintiffs Decedent was caused to be exposed to, and was unable to protect himself from the asbestos fibers, and consequently, Plaintiffs Decedent was exposed to asbestos in his work environment, and thereby suffered grave and progressive bodily injuries and death.

## COUNT THREE

### Negligence in the course of employment

123.    The Plaintiff adopts, alleges, and incorporates herein by reference all of the averments and allegations set forth in the preceding paragraphs of this complaint as if fully set forth herein.

124.    The third cause of action for personal injury and wrongful death is grounded in a legal theory of negligence and intentional tort.

125.    Plaintiffs Decedents were exposed to dangerous and carcinogenic asbestos fibers.

126.    The Defendants knew or should have known that Plaintiffs Decedents, in the course of their employment, were being exposed to asbestos-containing products and/or materials which would injure Plaintiffs Decedents, and the Defendants owed a duty of care to Plaintiffs Decedents to protect them from the dangers of exposure to the asbestos-containing

products and/or materials.

127.    The Defendants specifically disregarded the safety and health of Plaintiffs Decedents and failed to protect them from the carcinogenic and other adverse effects of the asbestos fibers to which he was exposed by (a) failing to warn Plaintiffs Decedents that they was being exposed to dangerous asbestoscontaining products, and by (b) failing to remove the dangerous asbestoscontaining products and/or materials promptly after the Defendants became aware of their presence and the dangers thereof.

128.    The Defendants further concealed from Plaintiffs Decedents the carcinogenic and other adverse effects of the asbestos fibers to which they were exposed in their work environment.

129.    As a proximate result of the conduct of the Defendants, Plaintiffs Decedents were exposed to dangerous and carcinogenic asbestos fibers which caused them grave bodily injury and death.

## COUNT FOUR

### Fraudulent Concealment / Misrepresentation / Alteration of Medical Studies /Conspiracy /Aiding and Abetting Conspiracy

130.    The Plaintiff adopts, alleges, and incorporates herein by reference all of the averments and allegations set forth in the preceding paragraphs of this complaint as if fully set forth herein.

131.    As will be discussed below, the Defendants used a number of trade and industrial hygiene associations to further the goals of their conspiracy to control the dissemination of research and information regarding the hazards of asbestos and other substances to lend an air of independence and legitimacy to the information which was published, albeit in edited form.

46

132.    Defendant Metropolitan Life and other Defendants named herein, individually and/or as successors-in-interest of other corporations, and as agents of one another and as co-conspirators, aided, abetted, encouraged, counseled, assisted, agreed, and conspired among themselves and with other asbestos manufactures and distributors to injure Plaintiff's Decedent.

133.    Defendants acted in the following fashion:

A.    Metropolitan Life Insurance Company (Met Life) required a tangible quid pro quo from McGill University in the 1920s in exchange for them providing funding for a study of asbestos disease in Canadian miners.  The study was never published and agents of Met Life materially misrepresented in the published literature the fact that asbestos miners developed asbestosis.

B.    In 1932, Met Life, through its agents Dr. Anthony Lanza, Dr. Fellows, and others, assisted the Johns-Manville Corporation with medical examinations of over 1,000 employees of Johns-Manville's factory in Manville, New Jersey.  The report of this study shows that a large percentage of the employees suffered from pneumoconiosis, including asbestosis, including employees not directly involved in the manufacturing process.  This 1932 medical survey was not published in the medical literature and therefore was unavailable to scientists studying the issue of asbestos disease.  Further collaboration between the conspiring asbestos producers and Met Life officials continued this trend of intentional cover-up.

C.    Beginning in approximately 1934, Johns-Manville Corporation, through its agents, Vandiver Brown and attorney J. C. Hobart, and conspirator Raybestos-Manhattan, through its agents, Sumner Simpson and J. Rohrbach, suggested to Dr. Lanza,

Associate Medical Director of Met Life (insurers of Manville, Raybestos, and others), that Dr. Lanza publish a study on asbestosis in which Dr. Lanza would affirmatively misrepresent a material fact about asbestos exposure; i.e., the seriousness of the disease process, asbestosis. This was accomplished through intentional deletion of Dr. Lanza's description of asbestosis as fatal and through other selective editing at the behest of the asbestos industry that affirmatively misrepresented asbestosis as a disease process less serious than it actually is and was then known to be, and deletion of information concerning levels of exposure. As a result, Dr. Lanza's study was published in the medical literature in this misleading fashion in 1935. The Defendants were motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to influence proposed legislation to regulate asbestos exposure and to provide a defense in lawsuits involving Manville, Raybestos, and others, as well as Met Life, the insurer.

D.    In 1936, conspirators American Brake Block Corporation, Asbestos Manufacturing Company, Gatke corporation, Johns-Manville corporation, Keasby & Mattison company (then an alter-ego to conspirator Turner & Newall), Raybestos-Manhattan, Russell Manufacturing, Thermoid Rubber co., Southern Asbestos Co., (whose liabilities have been assumed by H. K. Porter Company), Union Asbestos and Rubber company, and United States Gypsum Company, entered into an agreement with the Saranac Laboratories. Under this agreement, these companies acquired the power to decide what information Saranac Laboratories could publish about asbestos disease and control in what form such publications were to occur. This agreement gave these conspirators power to affirmatively misrepresent the results of the work at Saranac and also gave these conspirators power to suppress material facts included in any study. On numerous

48

occasions thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing material scientific data resulting in numerous misstatements of fact being made about scientific data resulting in numerous misstatements of fact being made at scientific meetings.

E.    On November 11, 1948, representatives of the following conspirators met at the headquarters of Johns-Manville Corporation:  American Brake Block Division of American Brake and Shoe Foundry, Gatke Corporation, Keasby & Mattison Company (whose assets and liabilities were later purchased by H. K. Porter Company), Union Asbestos and Rubber Company, and U. S. Gypsum Company.  U. S. Gypsum did not send a representative to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on its behalf.

F.    At the November 11, 1948, meeting, these Defendants and their representatives decided to exert their influence to materially alter and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936.  Dr. Gardner's research involved the carcinogeniucity of asbestos in mice and also included an evaluation of the health effects of asbestos on humans with a critical review of the then-existing standards of dust exposure from asbestos and asbestos-containing products.

G.    At this meeting, the Defendants intentionally and affirmatively determined that Dr. Gardner's work should be edited to specifically delete material facts about the cancer-causing propensity of asbestos and the health effects of asbestos on humans and critique of the dust standards and then published it in the medical literature as edited by Dr. Arthur Vorwald.  The acts of these Defendants were carried out by co-

49

conspirator Defendant Met Life's agent, Dr. Lanza. These Defendants thereby fraudulently misrepresented the risks of asbestos exposure to the public in general and the class of persons exposed to asbestos, including Plaintiff's Decedent.

   H. As a direct result of influence exerted by the above-described conspirators, Dr. Vorwald published Dr. Gardner's edited work in January 1951, in the Archives of Industrial Hygiene and Occupational Medicine (Vol. 3, No. 1), a journal of the American Medical Association. The published version stressed those portions of Gardner's work that the conspirators wished stressed, but omitted references to cancer, to human asbestosis, and to the inadequacy of the then-established threshold limit values (TLV's). Furthermore, that article made a false claim that the published report was the complete survey of Dr. Gardner's work. The Defendants thereby fraudulently, affirmatively, and deliberately disseminated this misleading Dr. Vorwald publication to university libraries, government officials, medical doctors, agencies, the public, and others.

   I. Such action constituted a material affirmative misrepresentation of the total context of material facts involved in Dr. Gardner's work and resulted in creating an appearance that the inhalation of asbestos was less of a health problem than Dr. Gardner's unedited work indicated.

   J. The following conspirators and others were members of the trade association known as Quebec Asbestos Mining Association: Johns-Manville Corporation, Carey-Canada (individually and as successor to Quebec Asbestos Corporation), Rapid American Corporation (successor to Philip Carey and Quebec Asbestos Corporation, National Gypsum Company (n/k/a Asbestos Claims Management Corporation), Flintkote, Cape Asbestos, Turner & Newall (individually and successor to Bell Asbestos). The

members of Q.A.M.A. participated in the above-described misrepresentation of the work of

Dr. Gardner published by Dr. Vorwald in the AMA Archives of Industrial Health in 1951.

Evidence of the Q.A.M.A., as well as correspondence from Co-conspirators, indicates close

monitoring of the editing process by Q.A.M.A.'s representative, Ivan Sabourin, acting on

behalf of all Q.A.M.A's members.

K.     Defendants who were members of the Q.A.M.A. began, on or about

1950, to formulate a plan to influence public opinion about the relationship between

asbestos and cancer by influencing the medical literature on this subject and then touting

and disseminating this literature to the public and to organizations and legislative bodies

responsible for regulatory controls of asbestos with the specific intent of misrepresenting

the existing scientific information and suppressing contrary scientific data in their

possession and control.

L.     This plan of misrepresentation and influence over the medical literature

began on or about 1950 when the Q.A.M.A. members selected Saranac Laboratories to do

an evaluation of whether cancer was related to asbestos. After a preliminary report

authored by Dr. Vorwald in 1952 indicated that a cancer/asbestos relationship might exist

in experimental animals, the Q.A.M.A. members refused to further fund the study and it

was terminated and never publicly discussed.

M.     As a result of the termination of this study, these Defendants

fraudulently withheld information from the public and affirmatively misrepresented to the

public and responsible legislative and regulatory bodies that asbestos did not cause cancer,

including affirmative misrepresentations by conspirators' agents Kenneth W. smith, M.D.,

Paul Cartier, M.D., Arthur J. Vorwald, M.D., Anthony J. Lanza, M.D., Vandiver Brown,

51

and Ivan Sabourin, said misrepresentations being directed to inter alia, U. S. Government officials, Canadian Government officials, U. S. National Cancer Institute, other medical organizations, and the general public, including Plaintiff's Decedent.

N.    Subsequently, the Q.A.M.A. Defendant conspirators contracted with the Industrial Hygiene Foundation (I.H.F.) and Dr. Daniel Braun to further study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and Truan reported to the Q.A.M.A. that asbestosis did increase a worker's chances of incurring lung cancer.

O.    The Q.A.M.A. Defendants thereafter caused, in 1958, a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons with asbestosis was edited out by agents of the Q.A.M.A.  The published version of this study contained a conclusion that asbestos exposure did not increase the incidence of lung cancer, a conclusion known by the Defendant conspirators to be patently false.

P.    By falsifying and causing publication of studies concluding that the asbestos exposure did not cause lung cancer and simultaneously omitting a documented Finding that asbestosis did increase the risk of lung cancer, the Q.A.M.A. Defendants affirmatively misrepresented to the public and concealed from the public the extent of risk associated with inhalation of asbestos fibers.

Q.    In approximately 1958, the Q.A.M.A. Defendants publicized the edited works of Drs. Braun and Truan at a symposium in an effort to fraudulently misrepresent to the public and persons exposed to asbestos that the inhalation of asbestos dust would not cause cancer.

52

R.    The fraudulent misrepresentation beginning in 1946, as elaborated above and continuing with publication of the 1958 Braun/Truan study, influenced the standard set for the TLVs and inhibited the lowering of the threshold limit value due to the cancer risk associated with asbestos inhalation.

S.    In 1967, the Q.A.M.A. Defendants determined at their trade association meeting that they would intentionally mislead consumers about the extent of risk involved in inhalation of asbestos products.

T.    In 1952, a symposium regarding the health effects of asbestos was held at the Saranac Laboratories.  The following conspirators were in attendance:  Central Mining & Investment Corporation, Johns-Manville, Turner & Newall, Raybestos-Manhattan, and Q.A.M.A. members by way of their agents, Cartier, Sabourin, and LeChance.

U.    At this meeting, the occurrence of lung cancer and asbestosis in product users was discussed and the carcinogenic properties of all fiber types of asbestos were also discussed.  In an affirmative attempt to mislead the public about the extent of health risk associated with asbestos, and in an effort to fraudulently conceal those risks from the public, these Defendants conspired to prevent publication of the record of his 1952 Saranac Symposium and it was not published.  In addition, the conspirators induced Dr. Vorwald not to announce the results of his and Dr. Gardner's animal studies showing excess cancers in animals and thereby fraudulently misrepresenting existing data, albeit secret, that could not be publicized because of the secret provisions contained in the 1936 Saranac agreement required by the asbestos industry members.

53

V.    The following conspirators were members of the Magnesia Insulation Manufactures Association MIMA): Philip-Carey Corporation (predecessors to Rapid American Corporation), Johns-Manville, and others.

W.    In 1955, these conspirators caused to be published the MIMA 85% Magnesia insulation Manual. This manual falsely and fraudulently misrepresented that asbestos-containing products offered no hazard to workers who used these products.

X.    The following conspirators were members of the trade organization known as the Asbestos Textile Institute (ATI): Garlock, Uniroyal, Raybestos-Manhattan, Johns-Manville, H. K. Porter, Keasby & Mattison (individually and through its alter-ego Turner & Newell), National Gypsum (n/k/a Asbestos claims Management Corporation), Cape Asbestos and others.

Y.    In 1947, the members of the ATI, received a report from W.C.L. Hemeon regarding asbestosis that suggested re-evaluation of the then-existing TLVs for asbestos exposure. These Defendants and Metropolitan Life caused this report not to be published and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresented to the public and classes of persons exposed to asbestos that the then-existing TLV was acceptable. Thereafter, these Defendant conspirators withheld additional material information on the dust standards from The American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluation of TLVs for asbestos exposure.

Z.    In 1953, conspirator National Gypsum (n/k/a Asbestos Claims Management Corporation), through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos spray products, refused

to mail a proposed response to that division indicating that respirators should be worn by applicators of the products. National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed form such applicators the need for respirators.

AA.   In 1955, conspirator Johns-Manville, through its agent Kenneth W. Smith, M.D., caused to be published in the AMA Archives of Industrial Health, an article entitled A Pulmonary Disability in Asbestos Workers. This published study materially altered the results of an earlier study in 1949 concerning the same set of workers. This alteration of Dr. Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk associated with asbestos inhalation.

BB.   In 1955, the National Cancer Institute held a meeting at which conspirators Johns-Manville (individually and as an agent for other alleged co-conspirators) and Dr. Vorwald (as agent of co-conspirators) affirmatively misrepresented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer when, in fact, the conspirators were in secret possession of several studies which demonstrated that positive evidence did exist.

CC.   In 1957, the members of the ATI, jointly rejected a proposed research study on cancer and asbestos and this resulted in fraudulent concealment from the public of material facts regarding asbestos exposure and also constituted an affirmative misrepresentation of the then-existing knowledge about asbestos exposure and lung cancer.

DD.   In 1964, the members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently discussed

by Dr. Irvin J. Selikoff. Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer.

EE.   In 1970, through their agents, defendants The Celotex Corporation (predecessor of Rapid American Corporation) and Cary-Canada, affirmatively misrepresented that it had been in the asbestos business since 1918 and found no reported conditions of asbestosis or lung disease. This constituted a fraudulent misrepresentation about the material facts known to these Defendants.

FF.   All Conspirators approved and ratified and furthered the previous conspiratorial acts of conspirators Johns-Manville, Raybestos Manhattan, and Anthony J. Lanza, M.D., acting on behalf of Met Life, and all alleged co-conspirators during the relevant time period and circumstances alleged above, acted as agents and co-conspirators for the other conspirators.

GG.   Certain of the Defendants and/or co-conspirators, including but not limited to Westinghouse Electric Corporation, Metropolitan Life, Raybestos Manhattan, Johns-Manville, Dresser Industries, Harbison-Walker, General Refractories, Pittsburgh Corning, PPG Industries, General Electric, Uniroyal, Owens-Illinois and Owens-Corning Fiberglas, were members of the Industrial Hygiene Foundation (AIHF). The IHF, touted by its industry members as an independent research agency, was used by the members of the asbestos industry to suppress the truth about asbestos and other substances and generate misleading or outright substances and generate misleading or outright false scientific publications. For example, in the 1940s the IHF was contacted by the Asbestos Textile Institute to conduct a study on asbestos dust. Mr. W. C. L. Hemeon, an industrial hygienist who worked for the IHF, completed the study and forwarded the report entitled Report on

Preliminary dust Investigation for Asbestos Textile Institute in June 1947. Mr. Hemeon's report indicated that workers exposed to less than the recommended threshold limit value for asbestos were nonetheless developing diseases. The IHF never published this study and, in doing so, acted to conceal the study from the general public, including asbestos-exposed workers.

HH.   As discussed infra, the IHF also assisted in the QAMA in the publication of the edited version of the Braum Truan report in 1958 which reported the conclusion, known to the IHF and its members to be false, that asbestos exposure did not increase the incidence of lung cancer.

II.   The Activities of IHF and its members substantially assisted the co-conspirators by retarding the development of knowledge about the hazards of asbestos.

JJ.   Metropolitan Life and other co-conspirators downplayed the seriousness of the hazard of exposure to diatomaceous earth by misleading public health officials in California.

134.   As a direct and proximate result of the above referenced conspirators intentional publication of deceptive and misleading medical data and information as described in the preceding paragraphs, and upon which data the Plaintiff's Decedent, and those charged with warning them reasonably relied, the Plaintiff's Decedent inhaled or otherwise were exposed to and ingested hazardous dust resulting in the injuries described in this Complaint.

135.   Additionally and alternatively, as a direct and proximate result of Metropolitan Life's actions and omissions as described above, the Plaintiff's Decedent was caused to remain ignorant concerning the danger of human exposure to asbestos and other substances,

resulting in damage to the Plaintiff's Decedent by depriving the Plaintiff's Decedent, their

employers, and the general public of opportunities to be aware of the hazards of asbestos and

other substances exposure, and thus the opportunity to take proper safety precautions and/or

avoid this exposure. Because of this ignorance and intentional failure to warn, the Plaintiff's

Decedent inhaled, was exposed to, or otherwise ingested hazardous asbestos dust resulting in

the injuries described above.

136.    The conspirators fraudulently concealed from the Plaintiff's Decedent the

alteration of its published test results, the actions and omissions and concerted design and

conspiracy, all as described in the paragraphs above, until the Plaintiff's Decedent discovered

said conduct following these diagnoses of asbestos-related injuries.

137.    Certain of the Defendants, in addition, belong to the IHF and the AIA/NA also

known as the Asbestos Information Association/North America and took part in certain

activities wherein they individually and through their organization took steps to stop the

dissemination of information with regard to asbestos and its hazards, took steps to influence

proposed regulation of asbestos by making misleading statements regarding the health effects

of asbestos and conspired to make false representations with regard to the safety and hazards

of asbestos-containing products.

138.    Certain of these Defendants in the IHF, AID/NA, ATI, the Asbestosis

Research Council and/or other organizations, acting individually and as members of a

conspiracy and as agents of other co-conspirators took steps to fraudulently conceal and/or

fraudulently misrepresent the hazards of asbestos which proximately caused injury and death

to the Plaintiff's Decedent in the following manner:

(a)    published material or caused to be published material that the Defendants individually and/or through their organizations knew was false and incomplete in that the Defendants knowingly and deliberately deleted certain references to the known health hazards of asbestos and asbestos related products;

(b)    that the publication of these false and misleading reports and non-disclosure of documented reports on the health hazards of asbestos were done to maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos related products;

(c)    that the acts were perpetrated to influence in the Defendants' favor proposed legislation to regulate asbestos exposure, and

(d)    that the acts in question were also done to provide a defense in lawsuits brought for injury and death resulting from asbestos disease.

139.    In continuing their asbestos exposure, the Plaintiff's Decedent reasonably relied upon the published medical and scientific data about the purported lack of hazards of asbestos products, Defendants' false representations that their products were safe, and the lack of publicity about the hazards of asbestos, which he reasonably believed to be safe.

140.    Defendants individually, as members of a conspiracy, and as agents of other co-conspirators intended that the Plaintiff's Decedent rely upon the published reports regarding the safety of asbestos and asbestos-related products, to continue their exposure to those products.

141.    Defendants individually, as members of a conspiracy, and as agents of other co-conspirators are in a position of superior knowledge regarding the health hazards of asbestos and, therefore, the Plaintiff's Decedent had a right to rely on the published reports commissioned by the Defendants regarding the health hazards of asbestos and the absence of

published medical and scientific data regarding the hazards of asbestos and asbestos related products. This conduct was directed at all state of the United State including Alabama.

142.    Certain Defendants belonged to The Mellon Institute and the Industrial Hygiene Foundation (IHF), which were institutes whose functions included involved in research and communications to member companies regarding the health effects of inhaling asbestos dust. In 1935, The Mellon Institute conducted a meeting at which time a plan was developed where members of the asbestos industry would join together to combat publicity and dissemination of data on the hazards of asbestos.

143.    Beginning in the early 1940's, the IHF was involved in a study by W.C.L. Hemeon entitled Report of Preliminary Dust Investigation for Asbestos Textile Institute, June 1947. This study was done in connection with members of the Asbestos Textile Institute (ATI). This study found that workers exposed to less than the recommended threshold limit value for asbestos were nonetheless developing disease. The IHF never published this study and, in doing so, acted to conceal the study from the general public including asbestos-exposed workers.

144.    Beginning in the mid-1950's, the IHF and The Mellon Institute were involved in the publication of works by Dr. Braun and Mr. Truan entitled An epidemiological Study of Lung Cancer in Asbestos Miners. In its original form in September, 1957, this study had concluded that workers with asbestosis had an increased incidence of lung cancer and that the Canadian government had been under-reporting cases of asbestosis. The final published version of this study in June, 1958, deleted the conclusion that workers with asbestosis suffered an increased incidence of lung cancer and that the Canadian government had been under-reporting cases of asbestosis. The members and agents of the IHF and The

Mellon Institute, individually and through these organizations, conspired with the members of the Quebec Asbestos Mining Association (Q.A.M.A.) and their legal counsel, Ivan Sabourin, to delete the above-described information regarding asbestos and cancer.

145.   The above-described actions of the members and agents of the IHF and The Mellon Institute constituted intentional deception and fraud in actively misleading the public about the extent of the hazards connected with breathing asbestos dust.

146.   The above-described actions of the IHF and The Mellon Institute and their individual members substantially contributed to retarding the development of knowledge about the hazards of asbestos and thereby substantially contributed to injuries suffered by the Plaintiff's Decedent. The Plaintiff's Decedent reserves the right to supplement these allegations once the defendants have identified all their memberships in trade organizations and the memberships of their officers, agents, employees and directors.

## COUNT FIVE

### Product Liability, combined and concurring negligence, intentional tort and conspiracy

147.   The Plaintiff adopts, alleges, and incorporates herein by reference all of the averments and allegations set forth in the preceding paragraphs of this complaint as if fully set forth herein.

148.   The fourth cause of action for wrongful death is based on legal theories of product liability, combined and concurring negligence, intentional tort, and conspiracy.

149.   As a result of Defendants' actions, Plaintiffs Decedents were exposed to unreasonably dangerous, defective, negligently manufactured and marketed asbestos-containing products and/or materials, which caused grave and progressive bodily injury to Plaintiffs Decedents and which proximately caused the death of Plaintiffs Decedents.

61

150.   Plaintiffs assert that they have filed suit either within the applicable state statute of limitations period, and/or that their claims are timely as a matter of law pursuant to 42 U.S.C. § 9658, a provision of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). Under this provision, the running of the state statute of limitations for applicable actions is delayed until "the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages ... were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." 42 U.S.C. § 9658(b)(4)(A). The provision " 'creates a federally mandated discovery rule for the accrual of state law claims involving releases of hazardous substances that cause or contribute to personal injury.... ' " *Kowalski v. Goodyear Tire and Rubber Co.*, 841 F. Supp. 104, 107 (W.D.N.Y. 1994)(quoting *Soo Line Ry. Co. v. B.J. Carney & Co.*, 797 1472, 1487 (D.Minn. 1992). Application of the statute to a state law cause of action does not depend on the existence of an underlying federal CERCLA action. *Id.* at 107-08.

## JURY DEMAND AND AD DAMNUM

WHEREFORE, PREMISES CONSIDERED, the Plaintiffs hereby demands a trial by struck jury on all of the issues which have been or may hereafter be raised in any of the pleadings, whether filed by or on behalf of the Plaintiffs or any of the Defendants, and further demands judgment jointly and severally against all of the Defendants in an amount to be assessed by the jury as proper and just, together with all special and general damages

permitted under applicable law as the Court deems proper and just.

This ___5th___ day of December, 2007.

Respectfully submitted,

G. Patterson Keahey, Jr. ASB-6357-A64G
Law Offices of G. Patterson Keahey, P.C.
One Independence Plaza, Suite 612
Birmingham, Alabama 35209
Telephone: (205) 871-0707
Facsimile: (205) 871-0801
E-mail: info@mesohelp.com